IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| LAURA B., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 20-cv-03403 |
| v. | ) | |
| | ) | Magistrate Judge Jeffrey I. Cummings |
| KILOLO KIJAKAZI, Acting | ) | |
| Commissioner of Social Security,[1] | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Laura B. ("Claimant") moves to reverse or remand the final decision of the
Commissioner of Social Security ("Commissioner") denying her claim for disability insurance
benefits ("DIBs"). The Commissioner brings a cross-motion for summary judgment seeking to
uphold the decision to deny benefits. The parties have consented to the jurisdiction of a United
States Magistrate Judge pursuant to 28 U.S.C. §636(c). This Court has jurisdiction to hear this
matter pursuant to 42 U.S.C. §405(g). For the reasons that follow, Claimant's motion to reverse
the decision of the Commissioner, (Dckt. #18), is denied and the Commissioner's motion for
summary judgment, (Dckt. #23), is granted.

## I.    BACKGROUND

### A.    Procedural History

On May 9, 2017, Claimant (then fifty-one years old) filed a disability application alleging
disability dating back to June 5, 2015, due to limitations stemming from spinal stenosis,
degenerative disk disease, back surgery, arthritis, depression, high blood pressure, and asthma.

---

[1] In accordance with Internal Operating Procedure 22 - Privacy in Social Security Opinions, the Court
refers to Claimant only by her first name and the first initial of her last name. Acting Commissioner of
Social Security Kilolo Kijakazi has also been substituted as the named defendant. Fed.R.Civ.P. 25(d).

(R. 199).  Claimant's application was denied initially and upon reconsideration.  (R. 20).

Claimant filed a timely request for a hearing, which was held via video on February 12, 2019,

before Administrative Law Judge ("ALJ") James D. Wascher.  (R. 38-77).  Claimant appeared

with counsel and offered testimony at the hearing.  A vocational expert also offered testimony.

On April 24, 2019, the ALJ issued a written decision denying Claimant's application for

benefits.  (R. 17-37).  Claimant filed a timely request for review with the Appeals Council.  The

Appeals Council denied Claimant's request for review on April 13, 2020, (R. 1-6), leaving the

ALJ's decision as the final decision of the Commissioner.  This action followed.

### B.     The Standard for Proof of Disability Under the Social Security Act

In order to qualify for disability benefits, a claimant must demonstrate that she is

disabled.  An individual does so by showing that she cannot "engage in any substantial gainful

activity by reason of any medically determinable physical or mental impairment which can be

expected to result in death or which has lasted or can be expected to last for a continuous period

of not less than 12 months."  42 U.S.C. §423(d)(1)(A).  Gainful activity is defined as "the kind of

work usually done for pay or profit, whether or not a profit is realized."  20 C.F.R. §404.1572(b).

The Social Security Administration ("SSA") applies a five-step analysis to disability

claims.  20 C.F.R. §404.1520.  The SSA first considers whether the claimant has engaged in

substantial gainful activity during the claimed period of disability.  20 C.F.R. §404.1520(a)(4)(i).

At step two, the ALJ determines whether a claimant has one or more medically determinable

physical or mental impairments.  20 C.F.R. §404.1521.  An impairment "must result from

anatomical, physiological, or psychological abnormalities that can be shown by medically

acceptable clinical and laboratory diagnostic techniques."  *Id.*  In other words, a physical

or mental impairment "must be established by objective medical evidence from an acceptable

2

medical source." *Id.*; *Shirley R. v. Saul*, 1:18-cv-00429-JVB, 2019 WL 5418118, at *2 (N.D.Ind. Oct. 22, 2019). If a claimant establishes that she has one or more physical or mental impairments, the ALJ then determines whether the impairment(s) standing alone, or in combination, are severe and meet the twelve-month duration requirement noted above. 20 C.F.R. §404.1520(a)(4)(ii).

At step three, the SSA compares the impairment or combination of impairments found at step two to a list of impairments identified in the regulations ("the listings"). The specific criteria that must be met to satisfy a listing are described in Appendix 1 of the regulations. 20 C.F.R. Pt. 404, Subpt. P, App. 1. If the claimant's impairments meet or "medically equal" a listing, she is considered to be disabled, and the analysis concludes. If the listing is not met, the analysis proceeds to step four. 20 C.F.R. §404.1520(a)(4)(iii).

Before addressing the fourth step, the SSA must assess a claimant's residual functional capacity ("RFC"), which defines her exertional and non-exertional capacity to work despite the limitations imposed by her impairments. The SSA then determines at step four whether the claimant is able to engage in any of her past relevant work. 20 C.F.R. §404.1520(a)(4)(iv). If the claimant can do so, she is not disabled. *Id.* If the claimant cannot undertake her past work, the SSA proceeds to step five to determine whether a substantial number of jobs exist that the claimant can perform in light of her RFC, age, education, and work experience. An individual is not disabled if she can do work that is available under this standard. 20 C.F.R. §404.1520(a)(4)(v).

## C.    The Evidence Presented to the ALJ

Claimant seeks disability benefits due to limitations stemming from spinal stenosis, degenerative disk disease, back surgery, arthritis, depression, high blood pressure, and asthma.

3

(R. 199). She alleges a disability onset date of June 5, 2015, and her date last insured was March 31, 2019. (R. 21).

### 1. Evidence from Claimant's Medical Records

Claimant's appeal largely focuses on three impairments and the Court will address each in turn. First, Claimant developed back pain in 2000 and underwent a laminectomy in 2001. (R 657). Although she experienced significant relief following the procedure, her pain later returned. (R. 50). On August 6, 2014, an MRI of Claimant's spine showed, in part, degenerative changes, disk extrusion, and neural foraminal narrowing. (R. 339). She was diagnosed with post-lumbar puncture syndrome and lumbar radiculopathy. (*Id.*).

Claimant was still experiencing pain on January 28, 2015, despite having undergone physical therapy and repeated injections. (R. 380). Although she presented with weakness in the lower extremities and decreased deep tendon reflexes, she also demonstrated full motor strength in the upper extremities and was walking "without any assistance." (R. 380-81). Claimant received another MRI of her lumbar spine on August 2, 2018, which also showed degenerative changes, including disk herniation, foraminal narrowing, and evidence of a compressed nerve. (R. 785). Claimant is also morbidly obese and throughout the record her BMI ranged from 38, (R. 788), to more than 46, (R. 590). Treating providers opined that Claimant's weight could exacerbate her back pain. (R. 522, 536, 544, 569, 575).

In addition to her back pain, Claimant has also experienced problems with both knees. She first injured her left knee on July 11, 2016, when "her horse was startled and knocked her over." (R. 474). An x-ray of the knee from that time showed moderate osteoarthritis. (R. 462). Two years later, on July 27, 2018, Claimant "fell down a hill while carrying a lot of wood." (R. 994). During the fall, her right "leg went underneath her and she landed on top of it." (*Id.*). The

4

next day, Claimant presented to the emergency room with complaints of right knee pain. (*Id.*).

At the time, she reported no fatigue, no joint pain, and no lumbar spine pain. (*Id.*). She also

demonstrated a normal range of motion and normal strength. (R. 996). Claimant reported that

she was "unable to bear weight due to pain and [was] using her friend's cane." (R. 1100). An

examination revealed no fractures, but Claimant continued to experience pain, which was

"aggravated by walking and golfing." (R. 794). An August 9, 2018 x-ray of the knee revealed

signs of arthritis, osteophyte formation, and subchondral sclerosis. (R. 795).

Claimant's first documented report of left wrist pain is from May 9, 2018. (R. 1013). At

a June 27, 2018 orthopedic appointment, however, she informed the treating provider that the

pain had been ongoing for eight months. (R. 787). Claimant demonstrated decreased range of

motion and decreased strength in her wrist. (R. 801). An x-ray of the hand revealed "minor

degenerative changes" and the treating provider diagnosed De Quervain's tenosynovitis[2] in

Claimant's left wrist and CMC arthrosis in Claimant's left thumb. (*Id.*). Therapy and dry

needling were recommended. (*Id.*). Claimant was also fitted for a thumb brace, which she was

instructed to use during activities that might cause a "flare-up." (R. 789-90). The provider set a

goal for Claimant to return to unrestricted work activities in four to six weeks. (R. 801). The

next month, on July 18, 2018, Claimant reported that she had been regularly wearing the splint

and it seemed "to help a lot." (R. 791). Even so, she rated her pain as an eight out of ten. (*Id.*).

The physical therapist attributed this increased pain to recent physical therapy and dry needling

and noted that Claimant could work "as tolerated." (*Id.*). Claimant reported "almost complete

relief" after the dry needling procedure. (R. 804).

---

[2] De Quervain tenosynovitis is a condition that causes pain in the tendons on the thumb side of the wrist.
Mayo Clinic, *De Quervain Tenosynovitis*, (Last visited Feb. 13, 2023 ), https://www.mayoclinic.org/
diseases-conditions/de-quervain-tenosynovitis/symptoms-causes/syc-20371332.

On August 7, 2018, Claimant informed her therapist that she had fallen and aggravated her wrist injury. An exam revealed edema and weakness. (R. 808). On August 27, 2018, Claimant continued to report pain, although she noted that the splint and the dry needling were helpful. (R. 797). Claimant received an injection and no work restrictions were recommended. (R. 799). At a September 6, 2018 appointment, an exam revealed significant increased edema in her wrist since the last injection, as well as tenderness and weakness. (R. 812). No additional exhibits document Claimant's wrist impairment.

## 2.    Evidence from Claimant

Claimant completed a disability report on May 19, 2017. (R. 220). In it, she alleged that she could stand for three minutes, sit for ten to twenty minutes, walk a quarter of a mile, and lift up to five pounds. (R. 218). She could not kneel or climb more than ten stairs without pain. (*Id.*). She noted that she had no problems with concentration, completing tasks, and understanding or following instructions, and that she could pay attention "forever." (R. 218). Side effects of her medications included tiredness and feeling "too relaxed." (R. 220). Regarding her daily activities, Claimant stated that she sometimes did light dusting and a little laundry, but that it took her an entire day to do one or two loads. (R. 214). She reported that "most days [she was] not able to do anything but let out the dogs." (*Id.*). She required assistance getting dressed. (R. 214). She could prepare her own meals, but it took her about thirty minutes to make scrambled eggs. (R. 215). Claimant could drive and she went shopping once a week for food and toiletries. (R. 216).

Claimant elaborated on these symptoms at the February 12, 2019 hearing before the ALJ. She testified that she could carry a gallon of milk from the refrigerator to the counter, but not from the car to the house. (R. 64). She also alleged that she had difficulty carrying even light

objects, such as her glasses or a box of tissues, due to pain and balance problems. (R. 64-65). Claimant could walk down a flight of stairs by leaning against the wall, but testified that she could only climb stairs if she crawled. (R. 62). She could drive for only twenty minutes at a time due to back and knee pain. (R. 63). Claimant had trouble sleeping due to back and hip pain, which leaves her tired during the day. (R. 56). She also reiterated that her medications caused drowsiness. (*Id.*). She said that she would nod off "most every day," "just out of the blue." (R. 57).

### 3. Evidence from State Agency Consultants

State agency consultant Julio Pardo, M.D., reviewed Claimant's file on July 3, 2017. (R. 88). He found that Claimant's spine disorder and joint disorder were severe. (R. 83). Despite these impairments, Dr. Pardo opined that Claimant could occasionally lift or carry twenty pounds; frequently lift or carry ten pounds; stand and/or walk for six hours in an eight-hour workday; sit for six hours in an eight-hour workday; frequently climb ramps and stairs; occasionally climb ladders, ropes, and scaffolds; and frequently kneel, crouch, and crawl. (R. 86-87). Claimant had an unlimited ability to push, pull, balance, and stoop, but should avoid concentrated exposure to noise, vibration, fumes, odors, dusts, gases, and poor ventilation. (R. 87-88). According to Dr. Pardo, Claimant should be limited to light work. (R. 89). Young-Ja Kim, M.D., reviewed Claimant's file on January 16, 2018, and affirmed Dr. Pardo's findings. (R. 101-02).

State agency psychological consultant Howard Tin, Psy.D., reviewed Claimant's file on June 23, 2017. He found that Claimant had a mild limitation in her ability to understand, remember, and apply information, but no limitations in the other paragraph B categories. (R. 84). He concluded that her depression and anxiety were not severe and he did not recommend

any corresponding functional restrictions. (R. 84). Maria Yapondijian-Alvarado, Psy.D., reviewed Claimant's file on August 25, 2017, and found that Claimant had a mild limitation in every functional category, including concentration, persistence, and pace. (R. 97). She noted that "[a]lthough the claimant's psychiatric medically determinable impairment [could] be expected to produce some limitations in function, the extent of the limitations described by the claimant that are the result of psychiatric symptoms exceeds that supported by the weight of the overall findings." (R. 98). Despite her findings, Dr, Yapondijian-Alvarado recommended no RFC restrictions. (R. 99).

### D.     The ALJ's Decision

The ALJ applied the five-step inquiry required by the Act in reaching his decision to deny Claimant's request for benefits. At step one, the ALJ found that Claimant had not engaged in substantial gainful activity between the alleged onset date of June 5, 2015, and the date last insured of March 31, 2019. (R. 23). At step two, he determined that Claimant suffered from the severe impairments of degenerative disk disease of the lumbar spine status post laminectomy, osteoarthritis of the bilateral knees, morbid obesity, asthma, and hypertension. (*Id.*). He found that Claimant's migraines and depression were non-severe. (*Id.*). The ALJ considered the "paragraph B" factors for mental disorders and found that Claimant had a mild limitation in understanding, remembering, or applying information; no limitation in interacting with others; a mild limitation in concentrating, persisting, or maintaining pace; and no limitation in adapting or managing herself. (R. 23-24). The ALJ found that Claimant's left radial styloid tenosynovitis was non-severe because there was "no evidence in the record that the condition lasted or was expected to last for a period of at least [twelve] months." (R. 23) (citing 22F, at 1, 15).

At step three, the ALJ concluded that Claimant did not have an impairment or combination of impairments that met or medically equaled one of the Commissioner's listed impairments. (R. 25). Before turning to step four, the ALJ determined that Claimant had the residual functional capacity to perform light work as defined in 20 C.F.R. §404.1567(b), with the following limitations:

> [S]he [could] engage in no climbing of ladders, ropes, or scaffolds; climb stairs or ramps frequently; can occasionally stoop, kneel, crouch, and crawl; must avoid concentrated exposure to excessive noise, excessive vibration, fumes, odors, dusts, gases, and poor ventilation.

(R. 26). At step four, the ALJ found that Claimant could not perform her past relevant work as an animal trainer. (R. 30). Even so, at step five, the ALJ concluded that a sufficient number of jobs existed in the national economy that Claimant could perform, including the representative jobs of cashier, housekeeping cleaner, and mail clerk. (R. 31). As such, the ALJ found that Claimant was not disabled between her alleged onset date and her date last insured. (*Id.*).

## II.     STANDARD OF REVIEW

A claimant who is found to be "not disabled" may challenge the Commissioner's final decision in federal court. Judicial review of an ALJ's decision is governed by 42 U.S.C. §405(g), which provides that "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. §405(g). "Substantial evidence is not a high threshold: it means only 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Karr v. Saul,* 989 F.3d 508, 511 (7th Cir. 2021), *quoting Biestek v. Berryhill*, 139 S.Ct. 1148, 1154 (2019) (internal quotation marks omitted). The Commissioner's decision must also be based on the proper legal criteria and free from legal error. *Scheck v. Barnhart*, 357 F.3d 697, 699 (7th Cir. 2004); *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002).

A court reviews the entire record, but it does not displace the ALJ's judgment by reweighing the facts, resolving conflicts, deciding credibility questions, making independent symptom evaluations, or otherwise substituting its judgment for that of the Commissioner. *McKinzey v. Astrue*, 641 F.3d 884, 889 (7th Cir. 2011); *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008). Instead, the court determines whether the ALJ articulated an "accurate and logical bridge" from the evidence to his conclusions. *Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2008). This requirement is designed to allow a reviewing court to "assess the validity of the agency's ultimate findings and afford a claimant meaningful judicial review." *Scott v. Barnhart*, 297 F.3d 589, 595 (7th Cir. 2002). Thus, even if reasonable minds could differ as to whether the claimant is disabled, courts will affirm a decision if the ALJ's opinion is adequately explained and supported by substantial evidence. *Elder*, 529 F.3d at 413 (citation omitted).

## III. ANALYSIS

Claimant argues that: (1) the ALJ erred by independently assessing medical evidence submitted after the state agency consultants had rendered their opinions; (2) the ALJ did not properly account for all of Claimant's physical and mental impairments in the RFC assessment; and (3) the ALJ's assessment of Claimant's subjective complaints was patently wrong. The Court disagrees on all counts and will address each argument in turn.

### A. Because the evidence submitted after the state agency consultants reviewed Claimant's file was not "potentially decisive," the ALJ was not required to solicit an additional medical opinion before rendering his decision.

Claimant contends that the ALJ erred by failing to seek a medical opinion regarding two pieces of evidence submitted after the state agency consultants' review of her file: (1) an updated MRI of Claimant's lumbar spine; and (2) evidence regarding Claimant's wrist impairment.

(Dckt. #18 at 5). Claimant argues that the ALJ impermissibly "played doctor" by interpreting this evidence himself. The Court disagrees.

The Seventh Circuit has repeatedly held that an ALJ may not "play [] doctor and interpret new and potentially decisive medical evidence without medical scrutiny." *McHenry v. Berryhill*, 911 F.3d 866, 871 (7th Cir. 2018) (internal quotation marks omitted); *see also Lambert v. Berryhill*, 896 F.3d 768, 774 (7th Cir. 2018); *Akin v. Berryhill*, 887 F.3d 314, 317–18 (7th Cir. 2018). In *Kemplen v. Saul*, the Seventh Circuit summarized its prior holdings as setting forth the following standard: "the ALJ must seek an additional medical opinion if there is potentially decisive evidence that postdates the state agency consultant's opinion." 844 Fed.Appx. 883, 888 (7th Cir. 2021). In other words, the issue "comes down to whether the new information 'changed the picture so much that the ALJ erred by . . . evaluating himself the significance of [the subsequent] report.'" *Id.* (citing *Stage v. Colvin*, 812 F.3d 1121, 1125 (7th Cir. 2016)). Here, the evidence submitted following the state agency consultants' reviews did not sufficiently alter the picture so as to require further medical input.[3]

---

[3] Although the Court agrees with the Commissioner that the ALJ was not required to seek an additional medical opinion, it disagrees with one of the Commissioner's arguments as to why. The Commissioner suggests that the ALJ was not required to obtain further medical review because Claimant – who was represented by counsel – "bore both the burden of proving her disability and the responsibility for any gaps in the record." (Dckt. #24 at 4). Therefore, the Commissioner contends it was Claimant's responsibility to acquire her own medical opinions on updated evidence. (*Id.*) (citing *Eichstadt v. Astrue*, 543 F.3d 663, 668 (7th Cir. 2008) (plaintiffs bear the risk of uncertainty associated with gaps in the administrative record)). The Seventh Circuit, however, has since rejected this exact argument. In *Kemplen*, the court clarified that *Eichstadt*'s holding was narrow and that "[s]ubsequent decisions have made clear that the burden is to produce *evidence*, not necessarily opinions." 844 Fed.Appx. at 888 (emphasis added) (citing *Scott v. Astrue*, 647 F.3d 734, 741 (7th Cir. 2011) (remanding in light of the ALJ's failure to obtain a medical opinion without reference to whether the claimant could or should have sought opinion evidence)).

1. **The 2018 MRI of Claimant's spine, which was similar to an earlier MRI reviewed by state agency consultants, was not potentially decisive.**

As explained above, *supra* at Section I(C)(1), on August 6, 2014, an MRI was taken of Claimant's spine.  (R. 339).  State agency consultants reviewed Claimant's file – including the 2014 MRI – on July 3, 2017, and January 16, 2018, and deemed Claimant capable of light work with restrictions.  (R. 88, 102).  The ALJ found their opinions to be "persuasive."  (R. 28).  An updated MRI was taken of Claimant's lumbar spine on August 2, 2018.  Claimant now argues that the ALJ "played doctor" by interpreting this latter MRI without medical assistance.

Claimant is correct that, as non-medical professionals, ALJs generally may not assess MRIs without the aid of medical experts.  *See McHenry*, 911 F.3d at 871 ("An ALJ may not conclude, without medical input, that a claimant's most recent MRI results are 'consistent' with the ALJ's conclusions about her impairments."); *Akin*, 887 F.3d at 317-18; *Goins v. Colvin*, 764 F.3d 677, 680 (7th Cir. 2014) (ruling that the ALJ erred by failing to submit claimant's first MRI in eleven years to medical scrutiny).  Even so, not all new evidence will necessitate a remand, and the Seventh Circuit has "upheld the denial of benefits when MRI evidence post-dating the state agency consultant's report showed only mild changes in the claimants' respective conditions."  *Kemplen*, 844 Fed.Appx. at 887 (citing *Keys v. Berryhill*, 679 Fed.Appx. 477, 481 (7th Cir. 2017)); *Olsen v. Colvin*, 551 Fed.Appx. 868, 875 (7th Cir. 2014)); *see also Archuleta v. Kijakazi*, No. 20-cv-4447, 2022 WL 787922, *4 (N.D.Ill. March 15, 2022) ("As the Seventh Circuit has been saying for nearly thirty years, an ALJ need not go back to the drawing board every time a claimant has another test; otherwise a decision might never be reached.").  While a non-medical person cannot *interpret* the technical findings within an MRI, he or she is certainly capable of looking at the language in both and recognizing similarities.  *See Halverson v. Saul*,

2021 WL 1927530 (W.D.Wis. May 13, 2021) (finding that an updated MRI was not likely to

change the reviewing physician's opinion where the only difference between it and an earlier

MRI was a "slightly worsened" disk at C6-7); *cf. Randy M. v. Kijakazi*, 20-cv-3912, 2022 WL

5183894, at *7 (N.D.Ill. Oct. 5, 2022) (outlining the "noticeable differences" between the MRI

findings considered by the state agency consultant and the MRI findings that post-dated the

consultant's report).

Here, although the 2018 MRI results did not mirror the 2014 findings verbatim, the Court

agrees with the Commissioner that a plain reading of the language of the respective findings

reveals that they report essentially the same problems in the same areas of Claimant's spine. (R.

785). In particular, whereas:

> (1) the 2014 MRI showed "moderate disk space narrowing" at L4-L5 and "advanced disk space narrowing at L5-S1," (R. 339), the 2018 MRI showed "prominent" disk space narrowing at L4-L5 and L5-S1, (R. 785);
>
> (2) the 2014 MRI showed "left paracentral disk extrusion [herniation] at L5, which appears to communicate with the disk at L4-L5," (R. 339), the 2018 MRI showed "small component of left paracentral disk herniation which extended superiorly from the disk level at L4-5," (R. 785);
>
> (3) the 2014 MRI indicated "mild to moderate spinal canal narrowing and severe narrowing on the left neural foramen at L4-L5" and "mild bilateral neural foraminal narrowing at L3-L4," (R. 339), and the 2018 MRI showed "moderate left neural foraminal stenosis [narrowing] at L4-5 and more mild at L3-4," (R. 785); and
>
> (4) both MRIs showed "degenerative" changes in the spine. (R. 339, 785).

This lack of any material differences between the MRIs distinguishes this case from those

relied on by Claimant, in which the unreviewed evidence "contained significant, new, and

potentially decisive findings." *Stage*, 812 F.3d at 1125-26 (unreviewed record showed that

claimant needed a hip replacement); *Goins*, 764 F.3d at 680 (unreviewed MRI showed a

worsening of the claimant's spinal problems); *Randall R. L. v. Comm'r of Soc. Sec.*, No. 1:19-cv-

141-MGG, 2021 WL 717529, at *4 (N.D.Ind. Feb. 23, 2021) (updated opinion required where "[m]any of these findings were not present in prior imaging studies."). Here, Claimant argues simply that, because her back condition is "degenerative," the updated MRI *likely* showed that Claimant's spinal condition had worsened, but she stops short of arguing that the MRI did, *in fact*, show that her condition had progressed. (Dckt. #25 at 4). Thus, Claimant's argument amounts to speculation, which is insufficient to require remand for further scrutiny of the MRI in question. *See, e.g., Keys*, 679 Fed.Appx. at 481 (although state agency doctors had not reviewed updated MRIs, remand was unwarranted because the claimant failed to provide "any evidence that the reports would have changed the doctors' opinions"); *see also Friedlund v. Colvin*, No. 14-cv-301-WMC, 2016 WL 4491737, at *4 (W.D.Wis. Aug. 26, 2016) ("In light of [Claimant's] failure to establish the import of . . . additional evidence, the record here falls short of other cases in which the Seventh Circuit found remand was required.").

> **2.    Evidence regarding Claimant's wrist was not potentially decisive because Claimant failed to show that the impairment had lasted or was likely to last twelve months.**

The first evidence of Claimant's left wrist pain in the record is dated May 9, 2018 – four months after the state agency consultant reviewed her file on reconsideration. (R. 1013). She was diagnosed with arthrosis in her thumb and tenosynovitis in her wrist on June 27, 2018, (R. 787-789), and the last exhibit in the record related to this impairment is from September 6, 2018, (R. 812). Together, the evidence related to Claimant's wrist spans only five months. The ALJ addressed this impairment only briefly at step two of his analysis:

> The Claimant was . . . found to suffer from an episode of left radial styloid tenosynovitis in June and September 2018, but there is no evidence in the record that the condition lasted or was expected to last for a period of at least [twelve] months . . . . Accordingly, the undersigned finds [this impairment] to be non-severe.

14

(R. 23).

Claimant argues that "the ALJ erred by speculating [Claimant's] tenosynovitis would not last [twelve] months," (Dckt. #18 at 7), but this mischaracterizes the ALJ's findings. Rather than speculating that Claimant's impairment would *not* last twelve months, the ALJ simply concluded that there was not enough evidence to show that it *had* or *would*.[4] Indeed, the ALJ *declined* to speculate that the condition would last twelve months in the absence of evidence to that effect – evidence which was Claimant's burden to provide. *See Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 352 (7th Cir. 2005) (the claimant bears the burden of proof at steps one through four of the SSA analysis); 20 C.F.R. Pt. 404, Subpt. P, App. 1 ("[A] longitudinal clinical record is generally important for the assessment of severity and expected duration of an impairment."). Accordingly, the ALJ's conclusion that there was insufficient evidence to show that Claimant's tenosynovitis had lasted or was likely to last twelve months was well-supported.[5] *See Al Akeel v. Berryhill*, No. 1:16-cv-908-DML-WTL, 2017 WL 3668105 (S.D.Ind. Aug. 25, 2017) ("Mr. Al Akeel's failure to address this discussion and evidence, instead only asserting the lack of

---

[4] In fact, the limited evidence in the record suggested that the impairment was *not* expected to last twelve months. Treatment notes repeatedly noted that Claimant should be able to "return to unrestricted work activities in [four to six] weeks." (R. 801, 805, 808, 812).

[5] Although Claimant did not identify this error and it is ultimately harmless, the Court notes that the ALJ improperly conflated the "durational" analysis with the "severity" analysis at step two of his decision. "A finding of duration says nothing about severity." *Davis v. Berryhill*, 723 Fed.Appx. 351, 355 (7th Cir. 2018). A severe impairment could, theoretically, last a few days and a non-severe impairment could last decades. "Therefore, the failure of an impairment to meet the duration requirement does not inform the ALJ regarding the severity of the impairment," *Montalta v. Colvin*, No. 1:15-cv-01392-JEH, 2016 WL 6407411, at*2 (C.D.Ill. Oct. 28, 2016), and the ALJ erred in finding Claimant's wrist impairment to be non-severe *because* it did not meet the durational test. *See, e.g., Brown v. Astrue*, No. 1:11-cv-01000-MJD-JMS, 2012 WL 2376069, at *4 (S.D.Ind. June 22, 2012) (finding the ALJ erred by "concluding that Brown's breast cancer was non-severe merely based upon her conclusion that it did not meet the duration requirement."). Despite this finding, the ALJ's error in this case was harmless. The question of whether Claimant's wrist impairment was severe or non-severe had no bearing on the ALJ's ultimate disability conclusion, as explained in Section III(B)(1), *infra*.

evidence that the duration requirement is *not* met, fails to show that the ALJ's finding was erroneous.") (emphasis in original).

The ALJ was not required to seek an additional medical opinion regarding only the durational requirement, especially given the fact that Claimant hypothesizes no functional restrictions that her wrist impairment may have caused. *See, e.g., Foster v. Saul*, No. 8:19-cv-680-T-TGW, 2020 WL 3960250, at *4 (M.D.Fla. July 13, 2020) ("Conspicuously missing from the plaintiff's submission is a treatment note or medical opinion indicating the functional limitations caused by the knee injuries and the expected duration thereof, both of which are necessary for the plaintiff to show a reasonable probability that this new impairment evidence would change the outcome of the decision."); *Sanchez v. Berryhill*, No. 18-cv-238-REB, 2019 WL 1254997, at n.5 (D.Colo. Mar. 18, 2019) ("Because there is insufficient evidence to suggest plaintiff's impairments were not adequately controlled with treatment for a continuous period of at least twelve months, I decline her invitation to remand for consideration of whether she might be entitled to a closed period of benefits.").

**B.** **The ALJ's RFC assessment adequately accounted for all of Claimant's impairments.**

Claimant next argues that the ALJ's RFC assessment failed to adequately accommodate: (1) limitations stemming from Claimant's wrist impairment; (2) Claimant's need for a cane; (3) Claimant's complaints of fatigue; (4) the side effects of Claimant's medications; (5) Claimant's obesity; and (6) Claimant's need for off-task time. The Commissioner generally responds that the ALJ's RFC determination "must stand" because it is more restrictive than any medical opinion in the record. (Dckt. #24 at 4). This is incorrect. Although the fact that no medical opinion in the record includes limitations more restrictive than the RFC is "illuminating and persuasive on its face," *Castile v. Astrue*, 617 F.3d 923, 930 (7th Cir. 2010), it does not relieve

16

the ALJ of his burden to build an accurate and logical bridge from the evidence to his

conclusions, *Briscoe ex rel. Taylor*, 425 F.3d at 351 (noting that the ALJ's failure to explain how

he arrived at his conclusions was "sufficient to warrant reversal of the ALJ's decision.").  Even

so, the Court agrees with the Commissioner that the ALJ's RFC assessment was supported by

substantial evidence here.

> **1.     The ALJ was not required to address Claimant's wrist impairment in the RFC because it did not meet the durational requirement or combine with her other impairments to create limitations lasting twelve months.**

The Court quickly dispenses with Claimant's argument on this point.  Because the ALJ

properly determined that Claimant's wrist impairment did not meet the twelve-month durational

requirement, *see* Section III(A)(2), *supra*, and because Claimant fails to suggest what additional

limitations her wrist condition imposed in combination with her other impairments (for the

required duration), the ALJ was not obligated to consider limitations stemming from this

impairment when assessing Claimant's RFC.  *See, e.g., Ramona G. v. Saul*, No. 19 C 1087, 2019

WL 5420140, at *2 (N.D.Ill. Oct. 23, 2019) (denying remand where "[t]he ALJ did not include

any wrist limitations because she found that plaintiff's tendonitis did not meet the duration

requirement necessary to qualify as an 'impairment.'"); *Al Akeel*, 2017 WL 3668105, at *4-5

(finding the ALJ was not required to discuss claimant's severe shoulder impairment in the RFC

assessment because it did not meet the durational requirement and claimant did not suggest that

it combined with other impairments in a way that would last twelve months); *Anthony v. Astrue*,

No. 4:11-cv-942 SNLJ/DDN, 2012 WL 2396853, at *11 (E.D.Mo. June 1, 2012) ("If an

impairment fails the durational requirement at Step 2, then the ALJ does not continue

considering it during the remainder of the disability analysis because the claimant is not disabled

in that respect.").

## 2. The ALJ adequately addressed Claimant's alleged need for a cane.

Claimant next argues that the ALJ's assessment of her need for a cane requires remand because he: (1) improperly rejected her reliance on a cane based on her lack of a prescription and her history of not bringing the cane to doctors' appointments; and (2) failed to assess the medical evidence that supported her need for a cane. (Dckt. #18 at 9). The Court disagrees.

It is true that an ALJ cannot reject a claimant's need for a cane based solely on the fact that she has not been prescribed one. *See Parker v. Astrue*, 597 F.3d 920, 922 (7th Cir. 2010) ("A cane does not require a prescription"). But the ALJ in this case made no such inference. Instead, he cited substantial evidence to support his finding that Claimant does not require a cane, including evidence that Claimant routinely presented with: (1) a normal gait, (R. 381, 416, 420, 423, 669, 690-93, 702, 816-17, 820, 936, 1008, 1028, 1076, 1107, 1119); (2) normal movement of extremities, (R. 288, 293, 322, 328, 338, 371, 377, 397, 682, 825, 984); and (3) normal strength, (R. 420, 423, 936, 984, 996). The ALJ also noted that "the medical record contains only one reference to the claimant's use of an assistive device for ambulation, when the claimant reported being unable to bear weight for one day after falling while carrying wood and using a friend's cane." (R. 28). Considering the RFC assessment in its entirety, it is clear that the ALJ relied on more than Claimant's lack of prescription to discount her allegations regarding her need for a cane. *Rice v. Barnhart*, 384 F.3d 363, 370 n.5 (7th Cir. 2004) ("[I]t is proper to read the ALJ's decision as a whole.").

As for Claimant's assertion that the ALJ failed to address evidence that *favored* her need for a cane, (Dckt. #18 at 8-9), it too is unfounded. Indeed, the ALJ explicitly addressed nearly every exhibit Claimant cites, including: (1) Claimant's testimony that she suffers from right knee pain, can stand for only a few minutes without leaning on something for support, uses a cane

twice a week and a walker four or five times per month, and was recommended a cane by a treating provider; (2) a July 2016 left knee x-ray showing moderate osteoarthritis; (3) an August 2018 right knee x-ray showing signs of arthritis, osteophyte formation, and subchondral sclerosis; (4) records indicating that Claimant had an antalgic gait; and (5) records showing decreased flexion and extension of the lumbar spine, deceased lumbar spine range of motion, and tenderness to palpitation in the lumbar paraspinal region. (R. 27-28). *See Terry v. Astrue*, 580 F.3d 471, 477 (7th Cir. 2009) (An ALJ "need not discuss every piece of evidence in the record," so long as he does not "ignore an entire line of evidence that is contrary to the ruling.").

Considering the ALJ's thorough review of the record, Claimant's arguments regarding the cane amount only to an invitation to reweigh the evidence, which the Court will not do. *See Gedatus v. Saul*, 994 F.3d 893, 900 (7th Cir. 2021) ("We will not reweigh the evidence, resolve debatable evidentiary conflicts, determine credibility, or substitute our judgment for the ALJ's determination so long as substantial evidence supports it.").

### 3.     The ALJ adequately accounted for Claimant's fatigue.

Claimant next argues that the ALJ failed to explain why he did not include a fatigue-related restriction in her RFC. (Dckt. #18 at 9). However, as the Commissioner notes, the ALJ acknowledged Claimant's testimony that she "nodded off most every day," and reported sleepiness and fogginess as a side effect of her medication. (R. 27). Claimant replies that acknowledging this evidence is insufficient; the ALJ must also explain his decision not to account for her fatigue. (Dckt. #25 at 13). Her position in this regard is misplaced.

The Court first notes that, according to the record, much of Claimant's fatigue stemmed from headaches and asthma. *See* (R. 690, 714) (Claimant's headaches caused fatigue); (R. 515, 545, 571, 583, 593, 1004) (Claimant's asthma caused sleep problems). The ALJ explicitly

addressed Claimant's headaches, finding that they had only minimal functional effect given Claimant's frequent denial that she experienced them. (R. 23) (citing R. 412, 515, 563, 595, 788, 822, 1003). The ALJ also concluded that Claimant's asthma was mild and well-controlled. (R. 25, 28). Claimant contests neither of these findings. Accordingly, the ALJ properly discounted her subjective complaints of fatigue to the extent that they related to these two impairments.

Next, to the extent that Claimant's fatigue is a symptom of her back impairment, doctors' notes indicating that Claimant was tired and Claimant's testimony that she nods off during the day are insufficient to show that her fatigue limited her ability to work. *See Perez v. Astrue*, 881 F.Supp.2d 916, 945 (N.D.Ill. 2012) ("A diagnoses, or symptom for that matter, does not automatically translate to a limitation or impairment and simply listing them proves nothing."). Although Claimant argues in her reply that a restriction allowing "for off-task time due to unexpected falling asleep" would have accounted for her fatigue, (Dckt. #25 at 13), she fails to identify any evidence to suggest that such a restriction was necessary. *Jozefyk v. Berryhill*, 923 F.3d 492, 496 (7th Cir. 2019) (it is a claimant's burden to identify "evidence-based restrictions that the ALJ could include in a revised RFC finding on remand"). Simply put, a claimant is not entitled to relief on appeal if she "does not identify medical evidence that would justify further restrictions." *See Loveless v. Colvin*, 810 F.3d 502, 508 (7th Cir. 2016).

Finally, ALJs are not required to address the credibility of Claimant's statements on a symptom-by-symptom basis. *See Shideler v. Astrue*, 688 F.3d 306, 312 (7th Cir. 2012) (noting that "an ALJ's credibility findings need not specify which statements were not credible," including claimant's assertion that she "needed to lie down several times per day"). The ALJ acknowledged Claimant's complaints of fatigue, found they were not entirely credible, and accommodated her symptoms by limiting her to light work. *See, e.g. Candice A. Z. v. Kijakazi*,

No. 19 C 8174, 2021 WL 3187783, at *10 (N.D.Ill. July 28, 2021) ("[T]he record demonstrates that the ALJ explicitly considered Candice's allegation of reduced energy and fatigue and accommodated her lifting and carrying difficulties by limiting her to light work."). This is sufficient.

### 4. The ALJ adequately accounted for the side effects of Claimant's medications.

Claimant similarly argues that the ALJ failed to explain how he considered the side effects of her medications – fatigue, nausea, and dizziness – when assessing her RFC. (Dckt. #18 at 15). Although the ALJ acknowledged that Claimant "reported sleepiness, fogginess, balance problems, and hunger as side effects of [her] medications," (R. 27), Claimant again argues that this recitation of evidence does not explain if or how her side effects were accommodated by the RFC's restrictions, (Dckt. #25 at 13). As above, Claimant's argument fails because there is nothing in the record to suggest that any functional restrictions are necessary to accommodate the side effects she experienced from her medications. *Prause v. Saul*, 18-cv-780-wmc, 2020 WL 702856, at *6 (W.D.Wis. Feb. 12, 2020) (finding ALJ adequately accounted for claimant's impairments where claimant "fail[ed] to explain what additional restrictions are required and how the record would support these additional restrictions"). The Court will not fault the ALJ for failing to make up limitations of his own. *See Katherine B. v. Berryhill*, No. 1:17-cv-04633-RLY-MJD, 2018 WL 4042116, *5 (S.D.Ind. Aug. 8, 2018) (finding claimant's argument that the ALJ made "no findings or conclusions as to the impact [her complained side effects] has on her ability to work" unfounded where the ALJ acknowledged the side effects and limited claimant to "light work" with restrictions).

**5.** **The ALJ adequately accounted for Claimant's obesity in the RFC assessment.**

Claimant next argues that the ALJ failed to explain why her "obesity did not aggravate her many musculoskeletal problems, or her difficulty breathing due to asthma." (Dckt. #18 at 10). According to Claimant, "[i]f the ALJ found that [her] obesity did not contribute to additional functional restrictions he was required to explain his reasoning." (*Id.*).

Contrary to this argument, the Court finds that the ALJ *did* explain how he accounted for Claimant's obesity in the RFC. First, he found that the condition was a severe impairment and acknowledged that it would have an "adverse impact upon co-existing impairments." (R. 25-26). Then, in the RFC analysis, he concluded that Claimant's severe impairments, *including* her "morbid obesity," warranted limiting her to light work with additional restrictions. (R. 29). This assessment clearly distinguishes this case from *Arnett v. Astrue*, cited by Claimant, where the ALJ failed to even acknowledge an obesity diagnosis. 676 F.3d 586, 593 (7th Cir 2012). ⸣

Furthermore, unlike in *Arnett*, the ALJ in this case expressly adopted the same limitations as those suggested by the state agency consultants. (R. 28). As the Seventh Circuit has indicated, an ALJ's failure to consider the effects of obesity is harmless when: (1) the ALJ adopts the limitations suggested by specialists and reviewing doctors who were aware of the condition, and (2) when the claimant fails to "specify how [her] obesity further impaired [her] ability to work." *Skarbek v. Barnhart*, 390 F.3d 500, 504 (7th Cir. 2004) ("[A]lthough the ALJ did not explicitly consider Skarbek's obesity, it was factored indirectly into the ALJ's decision as part of the doctors' opinions."); *see also Prochaska v. Barnhart*, 454 F.3d 731, 736-37 (7th Cir. 2006) (Because Prochaska failed to "specify how [her] obesity further impaired [her] ability to work," and because the record relied upon by the ALJ sufficiently analyzes her obesity, any error on the ALJ's part was harmless.").

Because the ALJ here relied on the opinions of medical professionals who were aware of Claimant's condition – *see* (R. 79, 91) (files reviewed by state agency consultants listing Claimant's height, weight, and BMI) – and because Claimant fails to identify evidence suggesting greater functional restrictions caused by her obesity, any error regarding the ALJ's consideration of the effects of Claimant's obesity is harmless. *See Hoy v. Astrue*, 390 Fed.Appx. 587, 592 (7th Cir. 2010) (rejecting argument that the ALJ failed to consider effect of impairments in combination when the plaintiff "only speculate[d] about the effect of these conditions on him"); *cf. Arnett*, 676 F.3d at 593 (noting that the harmless error standard was not met because the ALJ either discounted or never mentioned the opinions of physicians who specifically discussed the claimant's obesity).

### 6. The ALJ did not err by omitting a discussion of off-task time from the RFC analysis.

During the February 12, 2019 hearing, the ALJ asked the VE about the availability of jobs for someone who would be off-task for twenty percent of the workday. (R. 73). The VE responded that there would be no competitive work available for an individual who is off-task for more than fifteen to seventeen percent of the workday. (R. 73-74). Seizing on this question and response, Claimant contends that the ALJ's failure to analyze her propensity for off-task behavior in the RFC discussion warrants remand. (Dckt. #18 at 11). Again, the Court disagrees.

Although Claimant argues that the combination of her fatigue, anxiety, depression, and headaches would cause her to be off task beyond the competitive threshold, (*Id.*), she again cites no medical opinion in the record to support such a limitation. *See Spring W. v. Saul*, No. 20 C 1864, 2021 WL 2529615, at *6 n.5 (N.D.Ill. June 21, 2021) (where "no doctor opined that [claimant] would require an off-task time limitation . . . [claimant's] argument that the ALJ should have included an off-task time limitation, lacks merit.").

Furthermore, Claimant's argument implies that *any time* an ALJ solicits testimony from a VE with respect to off-task behavior, the ALJ must explicitly explain why he did not include that limitation in the RFC. However, "the ALJ was not required to discuss every response the VE gave to hypotheticals the ALJ ultimately discarded." *Clemente A. v. Saul*, No. 18-cv-6345, 2019 WL 3973117, at *5 (N.D.Ill. Aug. 22, 2019) (citing *Winsted v. Saul*, 923 F.3d 472, 477 (7th Cir. 2019)). Instead, "[t]he Seventh Circuit has made it clear that the ALJ is only required to include limitations that are supported by the record in the hypotheticals posed to the VE and in the RFC assessment." *Id.* (citing *Winsted*). Consequently, an ALJ does not err by posing a hypothetical regarding an off-task limitation to the VE and not including the VE's response in the RFC assessment when the medical record does not support an off-task restriction. *Id.*, at *5; *cf. Winsted*, 923 F.3d at 476-77 (holding that the ALJ erred not by failing to consider the VE's response to a hypothetical relating to time off-task, but rather by failing to pose a hypothetical to the VE which accounted for claimant's medically documented limitations with concentration, persistence, and pace); *Hawist v. Berryhill*, No. 17 cv 50126, 2018 WL 6399094, at *4 (N.D.Ill. Dec. 6, 2018) (where claimant had a medically documented off-task limitation, the ALJ erred by not discussing VE's response to hypothetical concerning claimant's off-task behavior when formulating claimant's RFC).

Here, the ALJ adequately explained his finding that Claimant's mild limitation in concentration, persistence, and pace did not require a corresponding RFC restriction. Namely, the ALJ relied on the opinions of state agency psychological consultants Drs. Tin and Yapondijian-Alvarado, who found that Claimant had either no limitation or a mild limitation in concentration, persistence, and pace, and recommended no mental RFC restrictions. (R. 84, 99). The ALJ found these opinions to be well-supported and consistent with treatment notes

indicating that Claimant has normal thought processes, thought content, memory, concentration, reasoning, judgment, insight, and behavior, (R. 29), as well as with Claimant's assertion that she "could pay attention forever," (R. 24).

Because Claimant did not have any medically documented limitation concerning the amount of time she would be off-task and because the ALJ adequately accounted for her mild limitation in concentration, persistence, and pace, the ALJ did not err by failing to discuss the VE's response to the hypothetical concerning off-task time.

### C. The ALJ's assessment of Claimant's subjective complaints was not patently wrong.

An ALJ's credibility findings receive special deference and will only be overturned if patently wrong. *Summers v. Berryhill*, 864 F.3d 523, 528 (7th Cir. 2017). "[P]atently wrong . . . means that the decision lacks any explanation or support." *Murphy v. Colvin*, 759 F.3d 811, 816 (7th Cir. 2014) (emphasis added) (citation omitted). Despite this deferential standard, Claimant argues that the ALJ in this case committed three errors when assessing her alleged symptoms and limitations. Namely, she asserts that the ALJ failed to: (1) follow the steps laid out in SSR 16-3p for evaluating allegations of pain; (2) explain how Claimant's activities of daily living ("ADLs") were inconsistent with her allegedly disabling pain and symptoms; and (3) consider how Claimant's serious treatment supported her allegations of pain. (Dckt. #18 at 12-13).

### 1. The ALJ followed the proper procedure for assessing allegations of pain per SSR 16-3p.

Claimant argues that the ALJ did not consider whether the objective evidence alone substantiated Claimant's allegations regarding the intensity, persistence, and limiting effects of the pain, as required by SSR 16-3p. *See* SSR 16-3p, 2016 WL 1119029, at *7. If he had, Claimant argues, he would have concluded that the evidence was consistent with Claimant's

allegations. (Dckt. #25 at 10). Instead, Claimant asserts that the ALJ summarized – rather than analyzed – the evidence in her medical record and relied on boilerplate language rather than analysis to find it inconsistent with her complaints.

This argument is another improper invitation to reweigh the evidence. The ALJ correctly identified the necessary steps under SSR 16-3p, (R. 26), summarized Claimant's allegations regarding the intensity, persistence, and limiting effects of her symptoms, (R. 26-27), and then explained why the medical evidence "fail[ed] to provide strong support for the claimant's allegations of disabling symptoms and limitations," (R. 27). Contrary to Claimant's assertion, the ALJ did not simply regurgitate the evidence in the medical record, but organized it such that the Court was able to ascertain "an accurate and logical bridge from the evidence" to his conclusions. *Dixon*, 270 F.3d at 1176.

For example, the ALJ grouped contradictory evidence together, showing Claimant's inconsistent results throughout the record. *See, e.g.,* (R. 28) (citing records noting that Claimant had positive straight leg tests as well as records noting that Claimant had negative straight leg tests). Specifically, the ALJ observed that despite medical imaging showing musculoskeletal impairments and records indicating some limited range of motion in the spine, positive straight leg tests, and an antalgic gait, Claimant "has repeatedly been found to have full range of motion of all extremities, normal muscle strength, negative straight leg raises, and a normal gait" and her "hypertension and asthma have been stable and controlled with treatment." (R. 29). While perhaps imperfect, the ALJ's SSR 16-3p analysis was far from patently wrong. *Johnson v. Barnhart*, 449 F.3d 804, 805 (7th Cir. 2006) (the ALJ has discretion to "discount the applicant's testimony on the basis of the other evidence in the case.").

26

2.      **The ALJ's assessment of Claimant's activities of daily living does not constitute reversible error.**

Next, Claimant takes issue with the ALJ's consideration of her activities of daily living. As explained above, in a disability report, Claimant alleged that she could stand for three minutes, sit for ten to twenty minutes, walk a quarter of a mile, and lift up to five pounds. (R. 218). She later testified that she could carry a gallon of milk from the refrigerator to the counter, but not from the car to the house. (R. 64). She alleged that she had difficulty carrying even light objects, such as her glasses or a box of tissues, due to pain and balance problems. (R. 64-65). She stated that she could only drive for twenty minutes at a time due to back and knee pain. (R. 63). The ALJ found these statements to be "not entirely consistent with the medical evidence and other evidence in the record." (R. 29). He wrote:

> The claimant has described daily activities, which are not limited to the extent one would expect, given her complaints of disabling symptoms and limitations. The claimant reported that she prepared simple meals, did some laundry, dusted, drove, and went shopping for toiletries. In addition, treatment notes from July 2018 indicate that the claimant was carrying a lot of wood, which is inconsistent with her testimony that she could not carry a gallon of milk from the car into the kitchen.

(*Id.*). Claimant raises three issues with regard to the ALJ's assessment. First, she argues that the ALJ erred by not explaining how these activities of daily living ("ADLs") were inconsistent with her alleged disabling pain and symptoms. Second, she faults the ALJ for failing to consider that, unlike at a job, Claimant could accommodate these ADLs by working around her symptoms. Third, she argues that the ALJ's reliance on the fact that Claimant carried wood constitutes impermissible cherry-picking and improper reliance on an ill-advised activity.

To begin, although the Seventh Circuit has "cautioned ALJs not to equate such activities with the rigorous demands of the workplace," *Alvarado v. Colvin*, 836 F.3d 744, 750 (7th Cir. 2016) (citations omitted), "it is entirely permissible to examine all of the evidence, including a

claimant's daily activities, to assess whether testimony about the effects of [her] impairments was credible or exaggerated." *Id.*, quoting *Loveless*, 810 F.3d at 508 (internal quotation marks omitted). Here, the ALJ's citation to Claimant's report of shopping once a week was appropriate, as this activity is plausibly inconsistent with her alleged inability to stand for more than three minutes or walk for more than fifteen minutes. *See, e.g., Prill v. Kijakazi*, 23 F.4th 738 (7th Cir. 2022) ("[T]he ALJ appropriately considered that – despite Prill's claimed limitations related to standing, sitting, kneeling, squatting, and crouching – she cooked, baked, vacuumed, did laundry, loaded the dishwasher, drove, played cards, gardened, and cared for minor children.").

The ALJ also properly considered the fact that Claimant injured herself while "carrying a lot of wood" in 2018, which was inconsistent with Claimant's self-report that she can only lift five pounds, is unable to carry a gallon of milk from her car to the kitchen, and is even unable to carry her glasses without pain. Claimant asserts that, because she hurt herself while carrying the wood, the activity does not show that she was more functionally capable than alleged. (Dckt. #18 at 12) (citing *Scrogham v. Colvin*, 765 F.3d 685, 700-01 (7th Cir. 2014) (where the claimant engaging in an activity led to a doctor's visit, the court noted that "[s]urely, this type of ill-advised activity cannot support a conclusion that Mr. Scrogham was capable of performing full-time work")). But critically, it was not the actual act of lifting the wood that injured Claimant here. Rather, she fell down a hill while carrying the wood and landed on top of her leg. (R. 994). Accordingly, the ALJ properly found that Claimant carrying "a lot of wood" was inconsistent with her allegation that she is unable to lift five pounds regardless of the injury she suffered *after* she successfully picked up and carried the wood.

Despite these findings, the Court does agree that the ALJ failed to explain the inconsistencies between Claimant's other daily activities and her claimed symptoms. For example, there is no obvious inconsistency between Claimant's ability to drive for twenty minutes and her inability to sit for longer than twenty minutes. Similarly, Claimant could engage in light dusting, do laundry, and prepare simple meals without needing to stand for more than a few minutes, walk more than a quarter mile, or lift more than five pounds at a time. *See Engstrand v. Colvin*, 788 F.3d 655, 661 (7th Cir. 2015) (the ALJ wrongly emphasized claimant's driving, "fail[ing] to understand" that it was "not inconsistent with being unable to engage in substantial gainful activity"). This is especially true in light of Claimant's qualifications as to *how* she completed these activities, which the ALJ apparently failed to consider. *See* (R. 214) (Claimant reported that it may take her an entire day to dust or do one load of laundry and most days she is unable "to do anything but let out the dogs"); (R. 215) (Claimant reported it takes her thirty minutes just to make scrambled eggs). *See Craft*, 539 F.3d at 680 (ALJ erred by concluding that claimant's activities "belie[d] his assertion of incapacity" without addressing claimant's "qualifications as to *how* he carried out those activities").

Nevertheless, despite this error, "[n]ot all of the ALJ's reasons [for discounting a claimant's symptom allegations] must be valid as long as *enough* of them are." *Halsell v. Astrue*, 357 Fed.Appx. 717, 722-23 (7th Cir. 2009) (emphasis in original) (upholding subjective symptom analysis despite finding that "the ALJ's reasoning [was] imperfect" because she "cited other sound reasons for disbelieving [claimant]"). Here, the ALJ offered other reasons to support his symptom assessment, including Claimant's other activities, the objective medical record, and the findings of state agency consultants, all of which provide substantial support for the ALJ's findings. (R. 29-30).

### 3. The ALJ properly considered Claimant's various treatments.

Finally, Claimant argues that the ALJ erred in his consideration of her treatment in two respects: (1) by failing to address Claimant's serious treatment, which was consistent with her allegations of debilitating pain; and (2) by failing to consider how the side effects of Claimant's treatment affect her RFC. Once again, the Court disagrees.

First, Claimant argues that the ALJ "did not explain how and if he considered [Claimant's] treatment," including her various prescriptions, physical therapy, and steroid injections. (Dckt. #18 at 15). However, the ALJ *did* acknowledge treatments undertaken by or recommended to Claimant, including a 2001 laminectomy, (R. 26), a recommended back surgery, which was being delayed due to her need to lose weight, (R. 27), monthly knee injections, (*Id.*), and all of Claimant's medications, (*Id.*).[6] Claimant does not cite any authority suggesting that an ALJ must cite every treatment undertaken by a claimant or indicating that further analysis of her treatment history was required here.[7] Furthermore, Claimant's argument

---

[6] The Commissioner suggests that the ALJ also took Claimant's physical therapy into account when assessing her subjective complaints, (Dckt. #24 at 9), however the ALJ mentioned Claimant's physical therapy before beginning his analysis in order to acknowledge that he had received and considered the records from Claimant's physical therapist. (R. 20). This is insufficient to show that the ALJ actually factored Claimant's physical therapy into his credibility assessment, as the Commissioner implied. Even so, the Court finds that this omission does not constitute reversible error. Much of Claimant's physical therapy had to do with her wrist impairment, which the ALJ properly found did not last for the required duration. *See* (R. 787-812); Section III(A)(2), *supra*. Claimant also underwent physical therapy for her left shoulder, (R. 340-57, 426-27). However, this too did not merit consideration where Claimant does not allege a medically determinable shoulder impairment. SSR 96-8P ("The RFC assessment considers only functional limitations and restrictions that result from an individual's medically determinable impairment or combination of impairments, including the impact of any related symptoms."). It is true that the ALJ failed to mention that Claimant was prescribed physical therapy for her hip in December 2017, for which she was "chronically late and non-compliant with performing exercises as prescribed." (R. 736). However, an ALJ need not mention every piece of evidence, *Terry*, 580 F.3d at 477, and Claimant does not explain why her participation in therapy is inconsistent with the ALJ's ultimate disability finding.

[7] Instead, Claimant cites two cases that have limited relevance here. *See Scrogham*, 765 F.3d at 701 (remanding where the ALJ misinterpreted the significance of the claimant's extensive treatment); *Carradine v. Barnhart*, 360 F.3d 751, 755 (7th Cir. 2004) (remanding where ALJ discounted the import

ignores the fact that the ALJ *did* credit her complaints to the extent that he limited her RFC. She does not suggest why her participation in physical therapy necessarily requires greater restrictions.

In sum: substantial evidence supports the ALJ's conclusion that Claimant's complaints were not entirely consistent with the record. The ALJ credited every medical opinion in the record and Claimant's activities, as well as the objective evidence, did not support various aspects of her testimony. Perhaps the ALJ's "reasoning was not airtight," but that is not the relevant standard. *Matthews v. Saul*, 833 Fed.Appx. 432, 437 (7th Cir. 2020) ("The conclusion we draw is not that Matthews' condition is not real and significant, but that his case is one of degree, and on this record a failure of proof against the backdrop of our deferential review.").

## CONCLUSION

For the foregoing reason, Claimant's motion to reverse the Commissioner's decision to deny her disability insurance benefits, (Dckt. #18), is denied and the Commissioner's motion for summary judgment, (Dckt. #23), is granted. The decision of the Commissioner is affirmed.

**ENTERED:  March 1, 2023**

**Jeffrey I. Cummings**
**United States Magistrate Judge**

---

of Claimant's treatment because her doctors were not able to find objective evidence to support her extreme account of pain).